# EXHIBIT D

From:     Thomas P. Fochs, PC
          Attorney at Law
          1565 North Serrano Avenue
          Los Angeles, California  90027
          Representative for Mr. William Gallucci

*NAI*

To:       OWCP

Re:       REQUEST FOR REVIEW UNDER 5 USC §8128(a)
          Claim of Mr. William T. Gallucci
          OWCP file number:     25-029327
          Date of Injury:       April 23, 1973

          Accepted condition: aggravation of pre-existing spondylolisthesis
          Concurrent disability: PTSD
          Lower back surgery / spinal fusion

Date:     May 15, 2001

---

## ISSUE #1:

**THE OWCP MUST REVERSE THE LOSS OF WAGE EARNING CAPACITY DETERMINATION OF FEBRUARY 21, 1975, AND PAY HIM FULL WAGE LOSS COMPENSATION FROM THE DATE OF HIS INJURY TO THE PRESENT AND ONGOING, LESS ANY WAGES EARNED OR WAGE LOSS COMPENSATION FOR OTHER OWCP-ACCEPTED DISABLING CONDITIONS.**

**Mr. Gallucci objects to the Loss of Wage Earning Capacity Determination of February 21, 1975, and requests the Director review his file under 5 USC §8128(a) in light of the new facts, legal arguments and rationale provided below, reverse the LWEC determination, and award Mr. Gallucci all wage loss compensation due him under the FECA from the date of the LWEC determination, and reimburse him for his self-directed vocational rehabilitation.  In support of this request, Mr. Gallucci provides the following:**

THE OWCP MUST REVERSE THE LOSS OF WAGE EARNING CAPACITY DETERMINATION OF FEBRUARY 21, 1975, BECAUSE:

A.    THE FILE CLEARLY DEMONSTRATES THAT, PRIOR TO THE L.W.E.C. DETERMINATION, MR. GALLUCCI WAS NOT MEDICALLY ABLE TO PERFORM THE CONSTRUCTED POSITION USED FOR THE LOSS OF WAGE EARNING CAPACITY DETERMINATION BECAUSE OF RESTRICTIONS AND LIMITATIONS CAUSED BY HIS ACCEPTED CONDITION/S.

B.    PRIOR TO THE L.W.E.C. DETERMINATION, THE OWCP FAILED TO OBTAIN A WELL-REASONED AND RATIONALIZED MEDICAL OPINION, BASED ON AN ACTUAL EXAMINATION OF MR. GALLUCCI TO DETERMINE HIS ESTABLISHED WORK RESTRICTIONS AND LIMITATIONS.

C.    PRIOR TO THE L.W.E.C. DETERMINATION, THE OWCP KNEW THAT DR. STACEY ROLLINS HAD OBJECTIVE EVIDENCE OF A RADICULOPATHY CAUSED BY THE ACCEPTED INJURY, AND WHICH HE ATTRIBUTED TO THE INJURY EVENT.  CONSEQUENTLY, THE OWCP KNEW THAT THE NATURE AND EXTENT OF MR. GALLUCCI'S INJURY/IES HAD CHANGED, AND WAS TRULY MORE DISABLING THAN WHAT WAS OFFICIALLY ACCEPTED AT THE TIME OF THE L.W.E.C. DETERMINATION.

D.    PRIOR TO THE L.W.E.C. DETERMINATION, THE OWCP KNEW THAT DR. STACEY ROLLINS HAD RECOMMENDED SURGERY TO ALLEVIATE THE RADICULOPATHY CAUSED BY THE ACCEPTED INJURY.  CONSEQUENTLY, THE OWCP KNEW THAT THE NATURE AND EXTENT OF MR. GALLUCCI'S INJURY/IES HAD CHANGED, AND WAS TRULY MORE DISABLING THAN WHAT WAS OFFICIALLY ACCEPTED AT THE TIME OF THE L.W.E.C. DETERMINATION.

E.    PRIOR TO THE L.W.E.C. DETERMINATION, THE OWCP KNEW THAT MR. GALLUCCI WAS NOT QUALIFIED TO PERFORM THE CONSTRUCTED POSITION BASED ON HIS EDUCATION, AGE, WORK EXPERIENCE OR KNOWLEDGE AT THE TIME THE L.W.E.C. WAS DEVELOPED.

## HISTORY AND FACTS OF THE CASE

Mr. Gallucci was injured when performing lifting activities in the performance of his job duties as an Apprentice at the Bureau of Engraving and Printing.

At the time of injury Mr. Gallucci was an Apprentice Plate Printer.

At the time of injury Mr. Gallucci was married and had a wife, son and daughter as dependants.

At the time of injury Mr. Gallucci's wage rate was calculated by OWCP to be approximately $185 -$200 per week.

At the time of injury Mr. Gallucci's treating physician was Dr. Samuel R. Sawmiller, who first examined Mr. Gallucci on April 23, 1973, for the work-related injury.

Either COP or Wage Loss Compensation was received from the first day following the injury.

Wage loss Compensation was paid on a continuing basis thereafter.

OWCP certified night differential pay on June 13, 1973.

OWCP certified Veterans Administration benefits on June 8, 1973.

The Veterans Administration certified benefits on July 5, 1973.

OWCP verified work activities with Mr. Gallucci using a form CA -1037a on August 2, 1973. This letter also noted that Mr. Gallucci was fit for light duty and asked the Bureau of Engraving and Printing for a light duty job offer for Mr. Gallucci. The Bureau of Engraving and Printing never provided Mr. Gallucci with a limited duty job to accommodate his work related limitations, and in fact fired Mr. Gallucci because he was unable to return to full duty.

On July 30, 1973 Dr. Sawmiller advised against a spinal fusion and recommended vocational rehabilitation and against a job requiring physical

labor. At this time Dr. Sawmiller was not aware of the OBJECTIVE testing that demonstrated a need for surgery.

On September 21, 1973, OWCP made a note to file advising Mr. Gallucci to submit Form CA-8 based on Mr. Gallucci's phone call to the OWCP.

On September 25, 1973 Mr. Gallucci called OWCP to inform them that he was not accommodated at the Bureau of Engraving and that the Bureau of the Engraving had told him that he was going to be fired. On September 26, 1973, an OWCP claims examiner with the initials R.D., made a note to file that the Bureau of Engraving stated there was no light duty work available for Mr. Gallucci.

On September 28, 1973, Dr. Sawmiller drafted a letter stating that a spinal fusion was not a good option and that Mr. Gallucci should complete an education and do something other than physical labor for a career.

On October 25, 1973, Mr. Gallucci retained the law firm of Ashcraft and Gerel to represent him before OWCP.

On October 26, 1973, an attorney reviewed the file at OWCP.

On November 14, 1973, Dr. Stacy L. Rollins, who examined Mr. Gallucci on referral from Mr. Gallucci's regular doctor, Victor Chupkovich, stated there was solid evidence of a radiculopathy involving the first sacral nerve root on the left side. This was based on examinations of July 20, 1973, and November 14, 1973.

*       Dr. Rollins **recommended surgery** involving a nerve decompression and spinal fusion – the doctor believed the results would be good, and that Mr. Gallucci would be able to return to full duty after recovery.

*       Dr. Rollins made this diagnosis after reviewing the nerve conduction studies and **electromyography** obtained from the Department of Physical Medicine at Cafritz Memorial Hospital.

*       Dr. Rollins noted that the electromyography showed **lumbo-sacral radiculopathy on the left side**.

4

\*      In that report, **Dr. Rollins opined that Mr. Gallucci had aggravated a congenital spondylolisthesis by his injury of April 23, 1973.**

THIS REPORT WAS PROVIDED TO THE OWCP, BUT NOT TO MR. GALLUCCI OR DR. SAWMILLER.  MR. GALLUCCI FINALLY RECEIVED A COPY OF THIS REPORT WITH HIS OWCP FILE IN THE YEAR 2000.

When the OWCP received this report, <u>it should have been handled this as a request for immediate surgery from a treating physician</u>.  The OWCP never responded to this request, and never developed a second opinion to evaluate the need for surgery as it should have at that time.

On December 17, 1973, Dr. Sawmiller completed a certificate stating that Mr. Gallucci could not do physical labor type of work and this disability would continue indefinitely.

In an undated document in Mr. Gallucci's file, located near other documents dated approximately November and December of 1973, OWCP referred Mr. Gallucci to vocational rehabilitation.  <u>The confidential documents sent to the vocational rehabilitation specialist, Mr. William C. Lauterbaugh, failed to note that Mr. Gallucci had other concurrent disabilities as recorded by OWCP on its form BEC-800.</u>   This undated document seems to direct Mr. William C. Lauterbaugh to test Mr. Gallucci and review whether or not re-training was viable.

On December 17, 1973, Mr. William C. Lauterbaugh sent Mr. Gallucci a letter directing him to contact a Mr. Al Skrypsak, at the Division of Vocational Rehabilitation at Prince George General Hospital in Cheverly, Maryland.  However, Mr. Gallucci was assigned to a Mr. Caldwell McMillan as a vocational rehabilitation specialist.  Mr. McMillan had Mr. Gallucci undergo psychological testing for about 3-4 hours, but those reports are not in the file provided to Mr. Gallucci.

From December of 1973, through February of 1974, Dr. Sawmiller submitted continuing medical documentation certifying Mr. Gallucci's disability.

On February 26, 1974, Mr. Gallucci informed OWCP that he was going to Northern Virginia Community College and that Dr. Sawmiller would be seen every two to three months.  OWCP advised Mr. Gallucci to submit Form CA-

8 without medical records and they would contact the doctor for the medical records

On February 28, 1974, OWCP approved Dr. Samuel Sawmiller as Mr. Gallucci's physician of record, and asked Mr. Gallucci to see the doctor and obtain work limitations and restrictions.

On April 22, 1974, OWCP placed Mr. Gallucci on the periodic roles at a rate of approximately $569.92 every four weeks, after FEHB were deducted.

On June 12, 1974, OWCP documented a telephone conversation with the rehabilitation counselor noting that Mr. Gallucci was using his GI Bill educational benefits to go to Northern Virginia Community College, where he was taking liberal arts courses. The rehabilitation counselor noted he had been in contact with Mr. Gallucci and he would keep OWCP posted regarding the rehabilitation efforts.

There was no statement that this assistance from the VA in any way undermined the rehabilitation effort of the OWCP.

There was no indication that Mr. Gallucci had failed to cooperate with OWCP's vocational rehabilitation effort at that time.

On or about June 28, 1974, Mr. Gallucci was dropped from the rolls of the Bureau of Engraving and Printing.

On July 15, 1974, Mr. Thomas M. Markey, Acting Supervisory Claims Examiner, wrote Mr. Gallucci stating the OWCP had determined that Mr. Gallucci was no longer totally disabled but only partially disabled and therefore a Loss of Wage Earning Capacity Determination may be completed.

On July 16, 1974, the Bureau of Engraving and Printing processed a dismissal of Mr. Gallucci stating that he was unable to perform the physical duties of his job as an **Apprentice Plate Printer**.

**THIS DOCUMENT DEMONSTRATES MR. GALLUCCI WAS AN APPRENTICE AND THEREFORE HIS WAGE LOSS COMPENSATION SHOULD HAVE BEEN COMPUTED UNDER THE "LEARNER'S POSITION" CRITERIA OF 5 USC §8113(A).**

On July 16, 1974, Mr. Gallucci completed OWCP form CA-654a, noting that he had been unable to obtain employment in the private sector because of his back injury and that he had not completed enough college courses to qualify himself for **any** job.

On July 22, 1974, **the OWCP sent Mr. Gallucci to Dr. Stacy Rollins at the USPHS for a second opinion evaluation**, despite having a report dated November 14, 1973, in the file from Dr. Rollins who had seen Mr. Gallucci in the role of a treating physician based on referrals from Mr. Gallucci's own treating physician/s.

On October 9, 1974, Dr. Stacy L. Rollins, complying with an OWCP request to provide a second opinion of Mr. Gallucci's condition, completed a second opinion evaluation of Mr. Gallucci. Based on that examination, Dr. Rollins stated that Mr. Gallucci could lift 50 lbs. on a continuing basis as a work activity.

It is noted that Dr. Rollins performed a prior examination of Mr. Gallucci based on a referral from Mr. Gallucci's regular physician, Dr. Chupkovich. The fact that Dr. Rollins had previously examined Mr. Gallucci based on a referral from the regular attending physician is noted in the second sentence of the history provided by Dr. Rollins – and should have caught the attention of the OWCP. This prior referral raises the issue of whether or not Dr. Chupkovich and Dr. Rollins had a professional relationship prior to the second opinion evaluation of October 9, 1974. Moreover, because Dr. Rollins was a prior treating physician, the OWCP may not use him as a second opinion examining physician. Thus, the report of November of 1974 which appears to have been a basis for determining Mr. Gallucci's work limitations for an LWEC determination must be given no evidentiary weight.

More importantly, the OWCP must not give the weight of the evidence to Dr. Rollins' opinion of October 9, 1974, because on that date he stated that Mr. Gallucci's condition had "nothing to do with his occupation," whereas on November 14, 1973, Dr. Rollins stated quite unequivocally "The condition [spondylolisthesis at the lumbo-sacral level] was aggravated by his injury of April 23, 1973." On both dates Dr. Rollins noted the spondylolisthesis was a congenital defect, but on the date closest to the injury, and when the referrals came from Mr. Gallucci's regular physician, he opined that Mr. Gallucci suffered an aggravation of the pre-existing condition. On the contrary, nearly a year later, Dr. Rollins, reverses his position on causal

connection, when the referral is from the OWCP – in spite of Dr. Rollins' ability to palpate a "step off" in Mr. Gallucci's lower lumbar area in October of 1974.

When a doctor makes a complete reversal of his opinion of causal connection as was done here, without any new or additional evidence on which to base that reversal, then the doctor's entire opinion is of greatly diminished, or no, value to the OWCP because it is not well reasoned or rationalized, and may well be demonstrating a bias against the claimant. Because of these actions by Dr. Rollins, any finding that Mr. Gallucci could, in February 1975, lift and carry 20 pounds or more as a regular, 8 hour a day work activity, has no medical basis in the record.

As noted above, this report was never forwarded to Mr. Gallucci or Dr. Sawmiller. It was sent to the OWCP, and should have been handled as a request for immediate surgery at that time. The OWCP never responded to this request, and never developed a second opinion surgical consult as it should have at that time.

**It was not until September 27, 2000, 26 years later, that this surgery was finally approved by the OWCP.**

Because of this, Mr. Gallucci has demonstrated that he suffered a change in the nature and extent of his disabling condition as of the date of Dr. Rollins' original surgery advice. Consequently, the LWEC by SCE Markey of February 1975 failed to account for the need for surgery, and cannot be seen as complying with Mr. Gallucci's actual medical condition at that time.

On October 30, 1974, OWCP, through SCE Thomas Markey, completed a Form CA-55, referring Mr. Gallucci for either vocational rehabilitation services, or to develop a constructed position for him.

It is noted that this form required a Rehabilitation Specialist to complete Items 15 – 17, but those are blank. This forms requires the Rehabilitation Specialist to provide the Claims Examiner with the type of available work, the prevailing salary, a description of the work to include the physical requirements and to quote the source of the description. Consequently, this form was never properly completed, at least not in the file provided to Mr. Gallucci.

8

Moreover, it is noted that SCE Markey's memorandum of January 31, 1975, was not completed by the Rehabilitation Specialist, but by SCE Markey, who was not a Rehabilitation Specialist. As such, SCE Markey violated the requirement of the very form he himself initiated.

On that form the OWCP demonstrated that it understood Mr. Gallucci's "Industrial Background" to be "Firefighter" and "Apprentice Plate Printer."

Because the OWCP had verified Mr. Gallucci's VA disability with the Veteran's Administration, it was on notice of his military experience in the US Army, and his Vietnam combat experience.

On or about October 30, 1974, the OWCP completed two forms, a CA-99 and a CA-815. Through one of these the District Medical Director decided Mr. Gallucci' physical work restrictions and limitations **without performing any examination of Mr. Gallucci.** The District Medical Director completed a form CA-815 stating that Mr. Gallucci could lift 20 to 50 lbs. for 8 hours per workday. It is noted that no other doctor found Mr. Gallucci able to lift 50 lbs. for 8 hours per workday since his Date of Injury. These restrictions and limitations exceeded all work restrictions and limitations of record prior to that time.

On November 14, 1973, Dr. Rollins examined Mr. Gallucci, eight months after the accepted injury occurred, and <u>found Mr. Gallucci to be suffering from an aggravation of a pre-existing Spondylolisthesis condition, and **solid evidence of radiculopathy.**</u>

**A year later, in October 9, 1974, nearly one and one-half years after the injury, in the second opinion narrative provided by Dr. Rollins, the diagnosis had changed.**

The report of Dr. Rollins dated November 14, 1974, states that Mr. Gallucci was referred to Dr. Rollins based on a letter from the District Medical Director, Donald P. Conwell, dated July 22, 1974.

This referral for a second opinion examination was improper because <u>there was **not a Statement of Accepted Facts in the file**</u> at the time of this examination. Moreover a second opinion examination cannot be performed by a treating physician.

9

Consequently any work restrictions or limitations would not be valid for the purpose of developing a Loss Of Wage Earning Capacity Determination because of this abuse of the second opinion process by the OWCP.

On January 31, 1975, Acting Supervisory Claims Examiner Thomas M. Markey, drafted a memo to file stating that Mr. Gallucci was qualified to perform lab technician duties under Department of Transportation Code 029.281, page 403, Volume I. In this review the SCE stated that:

1.    Mr. Gallucci was able to perform laboratory tests according to prescribed standards, to determine chemical and physical characteristics or composition of materials for purposes such as quality-control, process control, product development and conformity to specifications, and

2.    Mr. Gallucci was capable of setting up and adjusting lab apparatus and operating grinders, agitators, centrifuges, ovens, condensers, etc. and,

3.    Mr. Gallucci was capable of performing physical tests on samples of materials, able to test of raw materials for qualities such as permeability, load-bearing capacity and cohesiveness, and

4.    Mr. Gallucci was able to test solutions used in various manufacturing processes, and

5.    Mr. Gallucci was capable of examining materials using microscopes, record test results on standard forms and write test reports as well as clean and sterilize lab apparatus.

In summary, the SCE stated that on the basis of Mr. Gallucci's knowledge, age, work experience and educational background he was able to perform the work of a lab technician (tester). The claims examiner stated this work was light in nature and was reasonably available and would pay Mr. Gallucci $110 per week as a beginning salary

It is reported in the OWCP form CA-99, dated January 31, 1975, that the job of laboratory technician was light work requiring the ability to reach, handle, finger, feel and see. Light work being defined as normal lifting of 10 lbs. with maximum lifting of **20 pounds**.

**At the time of this memorandum to file, the OWCP had NOT obtained any specific physical work restrictions and limitations delineated by any doctor who had ever examined Mr. Gallucci, except the improperly obtained report of Dr. Rollins of October 1974.**

Consequently the OWCP did not have a valid medical report stating that Mr. Gallucci was capable of lifting 20 lbs. on a continuous basis as required by the constructed job position.

On January 31, 1975, SCE Markey drafted a memo to file stating that Mr. Gallucci's age, background and experience qualified him to perform work as a laboratory technician.

**THE EVIDENCE OF FILE DOES NOT SUPPORT THIS CLAIM.**

It is clear from the file that on January 31, 1975, the OWCP had absolutely no information whatsoever on which to base a claim that Mr. Gallucci had either the work experience, knowledge or the background to perform the work of a laboratory technician.

The only information in file on January 31, 1975, was that Mr. Gallucci had graduated from high school, entered the U.S. Army, served in combat in Vietnam, had been a Fireman, and had worked as an Apprentice at the Bureau of Engraving and Printing. There was no evidence in the file demonstrating that Mr. Gallucci could perform the required mathematics, or that he had any knowledge of chemistry or physics on which to base his ability to perform as a laboratory technician.

The ECAB has said on many occasions that the simple assertion that a person has the requisite age, background, knowledge and experience to perform the job used as the basis for a Loss of Wage Earning Capacity Determination may be overcome by evidence to the contrary. Moreover, before the OWCP can make such claims when developing an LWEC, it has the burden to establish the claimant is actually qualified to perform the work at the center of the LWEC Determination. Until the office has carried this burden of proof, or overcome evidence to the contrary when the issue is appealed, the LWEC must be reversed and all unpaid wage loss compensation must be paid to the claimant.

11

On February 25, 1975 Mr. Gallucci called OWCP and informed them that he was unable to perform the duties of a laboratory technician. The OWCP responded that Mr. Gallucci could follow his appeal rights.

On February 3, 1975, the OWCP's District Medical Adviser signed a form CA-99 stating that it was acceptable for Mr. Gallucci to perform the physical activities of a laboratory technician's job.

On March 7, 1975, Deputy Commissioner, P. L. Prewitt, wrote a letter to Mr. Gallucci acknowledging that although Mr. Gallucci was at the time of the LWEC determination attending college at Northern Virginia Community College under a training program sponsored by the Veterans Administration the OWCP was still allowed to make the loss of Wage Earning Capacity Determination. [Despite the deficiencies in the file of record.]

Mr. Gallucci was not under a training program sponsored by the Veterans Administration, he was simply using his GI Bill educational benefits based on his service in the US Military.

On April 7, 1975, the Branch of Hearings and Reviews wrote to Mr. Gallucci's attorney stating that to overcome to the Loss of Wage Earning Capacity Determination Mr. Gallucci needed to show that:

1.    the medical evidence demonstrated he was unable to perform the duties of the laboratory technician, **or** ;

2.    he was not qualified for the position **or** ;

3.    the work was not available in his area of residence.

On August 21, 1975, **6 months after the LWEC determination**, the Northern Virginia Community College drafted a letter stating that Mr. Gallucci had completed 65 transferable quarter credits and had pre-registered for an additional 17 credits for the fall quarter of 1975. Upon completion of the fall quarter Mr. Gallucci would be considered to be at the end of his sophomore year. Consequently as of January 1975, Mr. Gallucci did not have enough credits in the areas of biology, chemistry, physics and mathematics to qualify for the job of laboratory technician, as determined by the OWCP in its Loss of Wage Earning Capacity Determination.



On August 25, 1975, the Veterans Administration wrote a letter to Mr. Gallucci stating that he was approved for benefits.  The letter continued that Mr. Gallucci was going to go to American University to study biological sciences.

It is clear from the file that Mr. Gallucci was attending college on a self directed vocational rehabilitation effort before the OWCP placed him in its vocational rehabilitation program.  It is noted from the hearing transcript that from the Date of Injury until February of 1974 Mr. Gallucci's payments from the OWCP were spaced two to three months apart prior to the time he was placed on the periodic rolls.

On August 25, 1975, a **Hearing** was held at Mr. Gallucci's request to dispute the Loss of Wage Earning Capacity Determination.

As demonstrated by the hearing transcript, when Mr. Gallucci met Mr. Lauterbaugh, Mr. Gallucci was already enrolled in Northern Virginia Community College.  Mr. Lauterbaugh referred Mr. Gallucci to the Maryland Division of Vocational Rehabilitation and did, for all intents and purposes, nothing more for Mr. Gallucci.

Mr. Gallucci told the Hearing Representative that he was taking classes in History, English, Math, Psychology and Sociology.

**At the hearing, transcript page 27 through 29, Mr. Gallucci testified – without contradiction - that <u>he had not completed sufficient biology, chemistry or physics courses to be a laboratory technician</u> because his classes to that point in time had centered on the social sciences and he only had completed one introductory class in biology.**

Mr. Gallucci's hearing testimony was never controverted by either the employing agency or the OWCP.

**At hearing, transcript page 29, Mr. Gallucci testified that the "lab work" which he did for the college as part of a work study program, involved setting out pigs for dissection and putting slides in a box  - but there was no technical work involved.  Moreover the work was no more comprehensive than the usual dissection done in freshman biology class.  Mr. Gallucci further noted that he was nearly two semesters away from taking any calculus. ( See page 29)  Mr. Gallucci**

13

further testified that he would be taking chemistry and physics in the coming year.  See page 28.

Mr. Gallucci's testimony was never controverted by either the employing agency or the OWCP.

At hearing, Mr. Gallucci testified that prior military training certificates included: mine warfare school, demolition training, NC0 Academy, and leadership school.  See page 31.  Mr. Gallucci also testified that he had some experience working for the Federal Fire Department.  **See page 32**.

Mr. Gallucci's testimony was never controverted by either the employing agency or the OWCP.

At hearing, Mr. Gallucci testified that he had gone to the Civil Service Commission and looked at the requirements for lab technician positions.  **Mr. Gallucci testified that he did not meet the requirements because the lab technician positions required at least chemistry and math and he did not have the educational background for those jobs.**  See page 36.

**Mr. Gallucci further testified that he did not have organic chemistry, inorganic chemistry, physics, statistical analysis or calculus at the time of the LWEC determination.  See page 37.**

Mr. Gallucci's testimony was never controverted by either the employing agency or the OWCP.

On September 2, 1975, **seven months after the LWEC determination,** Mr. Gallucci was accepted for undergraduate study at the College of Arts and Sciences of the American University for the fall session 1975.

On November 18, 1975, following the hearing, Hearing Representative Robert C. Wurth, sent a letter to the Medical Director of OWCP.  The letter directed the OWCP to request work limitations caused by the residuals of Mr. Gallucci's injury from Dr. Sawmiller.  The hearing officer also directed the Medical Director for Federal Compensation to ask Dr. Sawmiller if Mr. Gallucci could perform the selected position. This is the first time the OWCP requested specific work imitations and restrictions regarding Mr. Gallucci from Dr. Sawmiller.  Likewise, this is the first time the OWCP requested Dr.

14

Sawmiller to comment on Mr. Gallucci's ability to perform the physical duties of a lab technician.

It is noted that although Dr. Sawmiller could opine on Mr. Gallucci's ability to perform the physical activities of the laboratory technician position, he could not opine on whether Mr. Gallucci's knowledge, work and educational experience qualified him for the position.

On November 21, 1975 the Medical Director for Federal Compensation wrote to Dr. Sawmiller requesting he provide an opinion as to whether Mr. Gallucci was capable of performing the physical duties of laboratory technician and asking Dr. Sawmiller to complete a Form CA-130 demonstrating Mr. Gallucci's work tolerance limitations.

On December 4, 1975, Dr. Sawmiller signed OWCP Form CA-130 without completing any of the work restrictions and limitations in detail. Moreover, on February 25, 1976, Dr. Sawmiller drafted a very brief letter to a Mrs. Scott, in which he stated that Mr. Gallucci could do work as a lab technician "as long as it doesn't involve repeated heavy lifting."

It is clear that Dr. Sawmiller's response did not satisfy OWCP's need for clear and specific work restrictions and limitations prior to the LWEC determination. The statement that Mr. Gallucci can do work that " doesn't involve repeated heavy lifting" is not specific enough to use as a basis for a Loss of Wage Earning Capacity Determination.

**On March 30, 1976,** Hearing Representative Wurth referred the file and Dr. Sawmiller's response to the District Medical Director. The Hearing Representative requested the Medical Director to provide work restrictions and limitations based on the record.

On April 21, 1976, in response to Hearing Representative Wurth's request, **OWCP's Medical Advisor, Arthur H. Lewis, M.D., stated that Mr. Gallucci was not capable of lifting more than 10 lbs. as a work activity.**

Because the constructed position of Laboratory Technician required lifting of up to 20 pounds as a work activity, the restrictions and limitations delineated by **Medical Advisor, Arthur H. Lewis, M.D.,** disqualified Mr. Gallucci from performing the constructed position of laboratory technician.

15

Consequently the job selected for Mr. Gallucci required him to lift up to 20 lbs. as a work activity, making it unsuitable for a Loss Of Wage Capacity Determination.

**The ECAB has held on many occasions that the OWCP may not use a job for an LWEC determination that does not comply with the claimant's established work restrictions and limitations.**

Because the Hearing Representative failed to send Mr. Gallucci for a valid second opinion examination selected by the OWCP itself, and because the most informed medical opinion was that of Medical Advisor, Arthur H. Lewis, M.D. [which disqualified Mr. Gallucci from performing the constructed position] the Hearing Representative was required to reverse the prior LWEC Determination.

On July 13, 1976, Hearing Representative Wurth, despite medical evidence to the contrary, upheld the original Loss of Wage Earning Capacity Determination.

On July 28, 1978, vocational rehabilitation specialist, Charles E. Terry, completed an OWCP form CA-1070 stating that Mr. Gallucci had refused OWCP rehabilitation services.

Mr. Terry failed to provide any evidence whatsoever that Mr. Gallucci refused OWCP rehabilitation services.

There is no memo to file from the vocational rehabilitation specialist in the field, Mr. Lauterbaugh, that Mr. Gallucci in any way refused to comply with the OWCP-sponsored vocational rehabilitation program.

There is no memo to file of a phone conversation to this same effect.

Consequently, Mr. Terry's assertions are without foundation and misrepresent the facts demonstrated by the file. On the contrary, the entire file is populated by letters from Mr. Gallucci pleading for the 0WCP to provide him with vocational rehabilitation training so that he can obtain a job with a better income to better support his family !

To compound this misrepresentation of Mr. Terry's, on July 21, 1981, Assistant Deputy Commissioner Benz wrote a letter to Senator Charles McC Mathias stating that Mr. Gallucci had refused vocational rehabilitation services from the OWCP. Clearly, even a casual review of the file demonstrates absolutely no justification for such a statement other than the single check mark made by Vocational Rehabilitation Specialist Terry in July of 1978. Moreover, a reasonable review of the file clearly demonstrates that Mr. Gallucci had been constantly asking the OWCP for vocational rehabilitation services – not refusing them!

There is nothing in the file to support a finding that Mr. Gallucci refused vocational rehabilitation services.

The file provided to Mr. Gallucci has no letter from the vocational rehabilitation counselor or the vocational rehabilitation specialist stating that Mr. Gallucci was impeding or refusing vocational rehabilitation services. The only evidence of file is that Mr. Gallucci utilized his GI Bill educational benefits – which is not a violation of any OWCP program – and in fact should have been encouraged by the OWCP, not a point to use as punishment. This is not sufficient to state that Mr. Gallucci was refusing vocational rehabilitation services from the OWCP – when in fact no services were ever offered.

On September 25, 1978 Mr. Gallucci was refused a job as a laboratory technician for the National Institute of Allergy and Infectious Diseases.

In August of 1978 Mr. Gallucci was denied a job with the National Institutes of Health. He had applied for a position as a biologist.

At about the same time Mr. Gallucci was denied a job as a research technician in the Genetics and Neuro-Physiology Department of the National Institutes of Health. Similarly in, it appears, 1978 or 1979, Mr. Gallucci was refused a job as an environmental specialist with the United States Department of the Interior.

On October 4, 1978, Mr. Gallucci wrote to the OWCP explaining that at the time of the Wage Earning Capacity Determination he had completed only one biology class and was not qualified to be a laboratory technician.

17



**Clearly, Mr. Gallucci was telling the OWCP that he did not have the age, education, work experience or knowledge required to perform the constructed position of laboratory technician.**

**This information should have prompted the OWCP to Review Mr. Gallucci's file under 5 USC §8128(a).**

In the file provided to Mr. Gallucci there are copies of his college transcripts.

It appears that these transcripts were introduced into the file in April of 1983, however, there is no clear date stamp demonstrating when OWCP received these transcripts.  However, the font and size of the date stamp on some of these transcripts appears to match other documents in the file, thus, it appears to be OWCP's date stamp.

Because Mr. Gallucci only attended a community college prior to entering American University in 1975, which he did **after** the LWEC determination, a review of the transcripts regarding Mr. Gallucci's college courses **prior** to the LWEC determination must be seen as persuasive evidence that **Mr. Gallucci DID NOT HAVE the educational background and experience to be a laboratory technician in February, 1975.**

From a review of the hearing testimony and the transcripts in the file, it is uncontroverted that Mr. Gallucci started his college career at the Community College of Northern Virginia.

(It is true Mr. Gallucci had work experience in the US Army, as a fire fighter and as an Apprentice at the Bureau of Engraving, however, it is also clear that none of the training or experience that was gained through these jobs was found by the OWCP to provide Mr. Gallucci with the knowledge, experience or background to perform the laboratory technician position used in the LWEC determination.)

**From the transcripts of classes taken prior to February, 1975**, it can be determined that:

In the **winter of 1972** Mr. Gallucci had no math or science classes that would qualify him for a job as a laboratory technician.

18

In the **spring of 1972** Mr. Gallucci took no math or science classes that would qualify him for a job as a laboratory technician.

In the **spring of 1973** Mr. Gallucci took General College Math I, from which he **withdrew**.  He also took a class in Natural Sciences I which he was **required to repeat**.

In the **fall of 1973** Mr. Gallucci took General College Math I receiving a grade of D.  This grade meant that Mr. Gallucci needed to repeat the course to achieve at least a passing grade of **C**.

In the **winter of 1974** Mr. Gallucci took General College Math II from which he **withdrew**.

In the **spring of 1974** Mr. Gallucci took General College Math II from which he **withdrew**.

In the **summer of 1974** Mr. Gallucci took College Math I from which he **withdrew**.

In the **fall of 1974** Mr. Gallucci took General Biology I receiving a grade of **C**.  Also in the fall of 1974 Mr. Gallucci took College Math I for which he received a grade of **D**.

As the above review demonstrates, as of the date of the LWEC determination, Mr. Gallucci had only passed Biology I, but had not passed any college math class whatsoever.

**MORE IMPORTANTLY, AS OF THE DATE OF THE LWEC DETERMINATION, THE OWCP DID NOT EVEN HAVE MR. GALLUCCI'S COLLEGE TRANSCRIPTS IN THE FILE!**

As of the date of the LWEC determination, Mr. Gallucci had only one, possibly, relevant class that he had passed, Biology I.

To this point in time, Mr. Gallucci had failed, withdrew or was required to repeat every math and science class that he attempted, except for Biology I.