Simply put, no reasonable analysis of Mr. Gallucci's knowledge, work or educational background could reasonably come to the conclusion that he was qualified to work as a laboratory technician as described in the LWEC determination of February 1975.

It is also noted that the psychological tests performed at the direction of Mr. Caldwell McMillan, which demonstrated that Mr. Gallucci would have had an extremely difficult time finishing any college courses, are not in this file.

Mr. Gallucci remembers being tested using the Ink Blot Test, House Tree Person Test, Rorschach Test, WAIS, MMPI, a Story Completion Test and a vocational aptitude test at the direction of Mr. McMillan. These tests and their results are not mentioned in the file in this case.

In the **winter of 1975**, <u>AFTER</u> the LWEC determination, Mr. Gallucci completed <u>General Biology II receiving a grade of **C**</u>.

Also in the **winter of 1975** Mr. Gallucci again took <u>College Math I, receiving a grade of **C** and College Math II receiving a grade of **D**</u>.

In the **spring of 1975** Mr. Gallucci took <u>General Biology III and received a grade of **C**</u>.

At this time Mr. Gallucci took <u>College Math III and received a grade of **F**</u>.

From even a casual review of Mr. Gallucci's transcripts from Northern Virginia Community College it is clear that he was not qualified to perform the functions, duties and responsibilities of a laboratory technician.

Mr. Gallucci either <u>failed or withdrew from College Math I, II, III on multiple occasions.</u>

<u>Mr. Gallucci received a grade of **C** in only College Math I, and received grades of **D** or lower, or withdrawing, from all other math and science classes, except for his biology classes, where he received grades of **C**</u>.

On March 9, 1982, Mr. Gallucci wrote to Senator Mathias, noting the OWCP provided no explanation of how he could be qualified to work as a

laboratory technician in light of his lack of training, education, skills and experience needed to qualify for the position. It was clear from Mr. Gallucci's letter that OWCP had not reviewed his educational and work experience background when making its bold, but incorrect, assertion that he was qualified, either academically or through work experience, to perform the work of a laboratory technician. Moreover Mr. Gallucci stated that the OWCP's own vocational rehabilitation consultants had stated that he was indeed not trainable and not able to succeed at school.

On June 21, 1983, the OWCP received a letter from Mr. Gallucci requesting that OWCP reimburse him for the costs of the self-rehabilitation program which he had carried the cost of by himself.

On July 15, 1983, Assistant Deputy Commissioner, Herman A. Cain, drafted a letter to Congressman Hoyer, in which **the OWCP summarized the case to date but did not offer any reasoning or rationale as to why it had failed to review the fact that at the time of the Loss of Wage Earning Capacity Determination the file contained no delineation of Mr. Gallucci's physical limitations and restrictions, nor did the file contain any reasonably accurate description of the physical requirements of the position of laboratory technician**.

The response failed to address the physical limitations found by the Hearing Officer's development of the case with the Medical Adviser, Arthur H. Lewis, M.D., and why the disparities mentioned above were not addressed by OWCP.

**The response to Congressman Hoyer failed to discuss the obvious inability of Mr. Gallucci to perform the job duties and responsibilities of a laboratory technician based on his lack of knowledge, work experience or background at the time of the LWEC determination.**

On July 15, 1983, Assistant Deputy Commissioner Cain wrote to Congressman Steny Hoyer. It is believed that at this time Mr. Gallucci's early college transcripts were in the file at OWCP [they have no date stamp, this conclusion is drawn given their physical location and estimated by the chronological order of surrounding documents]. As explained elsewhere those transcripts clearly demonstrate Mr. Gallucci had failed every college level beginning math class he attempted, save one. The only class that could possibly be relevant to being a laboratory technician was a grade of

"C" in biology.  It was also clear that Mr. Gallucci had not completed any chemistry or physics class to qualify him for being a laboratory technician.

Because the Assistant Deputy Commissioner had performed a review of the file at that time, and because the transcripts demonstrated Mr. Gallucci's total lack of educational coursework to perform the technical requirements of a laboratory technician were, presumably, in the file, Mr. Cain should have undertaken a review of the entire file by the Director under 5 USC §8128(a).

In August of 1983, Mr. Gallucci began working as a laboratory technician at the National Institute of Mental Health.  **This was 8 years after the LWEC Determination, and many college classes LATER.**

On September 12, 1983, OWCP's Chief Of Rehabilitation, Charles E. Terry, sent a letter to Mr. Gallucci stating that Mr. Gallucci did not need substantial vocational rehabilitation and that OWCP vocational rehabilitation would not have approved training to accomplish his return to suitable employment – even in 1975.  It is further noted that Mr. Terry's letter stated that at the time (presumably, of the Loss of Wage Earning Capacity Determination) Mr. Gallucci had successfully obtained an Associates [of] Arts degree from the Northern Virginia Community College using VA benefits to pay for the schooling.

**THIS STATEMENT IS FALSE BECAUSE IT IS CLEARLY CONTRADICTED BY THE EVIDENCE  IN THE FILE.**

Mr. Gallucci received his Associates Degree in Education on June 15, 1976, from the Northern Community College of Virginia, nearly **16 months after** the LWEC determination of February, 1975.

Based on the evidence in the record at the time of Mr. Terry's letter of September 12, 1983, the OWCP was in possession of Mr. Gallucci's academic records, including his transcripts from the Northern Community College of Virginia, the American University in Washington, D.C., and some transcripts from the University of Maryland.  It is clear from these transcripts that Mr. Gallucci never had the academic training, background or work experience to perform the lab technician job as stated by the Loss of Wage Earning Capacity Determination of February 1975.

Consequently, Mr. Terry failed to answer his own question: "was additional training necessary at that time [in 1975] for you (Mr. Gallucci) to accomplish medically suitable employment?"  Clearly at the time of the Loss of Wage Earning Capacity Determination, because Mr. Gallucci did not have the academic training necessary, much less the experience, background or knowledge to perform the job of laboratory technician as described in the Loss Wage Earning Capacity Determination, additional training was necessary for Mr. Gallucci to be able to accomplish medically suitable employment.

Simply put, Mr. Terry either failed to review the file, or he simply ignored the CLEAR evidence in the file at the time of his letter, and the information in the file at the time of the LWEC determination made by SCE Markey.

**MOREOVER, THE INTRODUCTION OF THE TRANSCRIPTS INTO THE FILE, AS WELL AS MR. TERRY'S REVIEW OF THE FILE IN 1983 REQUIRED THE OWCP TO RE-OPEN THE FILE UNDER 5 USC §8128(a).**

In addition to this, on October 25, 1983, Claims Examiner Kendrick wrote to the Director [Office unknown] stating that Mr. Gallucci was qualified as a laboratory technician at the time of the LWEC determination.  This statement was made despite the fact that Mr. Gallucci's transcripts [apparently] where in file and demonstrated that he had failed nearly every math class he had attempted, and that he had not completed any classes in chemistry or physics.  More importantly, this "review" should have triggered a Review of the entire file by the Director under 5 USC §8128(a).

<u>**On January 24, 1984, (nearly 9 years after the LWEC determination by SCE Markey) Dr. Samuel R. Sawmiller completed an OWCP Form 5, thereby, for the first time in the history of this claim, provided the OWCP with specific, detailed work restrictions and limitations regarding Mr. Gallucci.**</u>

On that form, Dr. Sawmiller noted that Mr. Gallucci could not engage in lifting for more than one hour per workday.  This lifting was to be intermittent and to not exceed 20 lbs.  It is noted the LWEC of 1975 never provided the amount of time that 20 pounds needed to be lifted to perform the selected job.

On March 23, 1981 Dr. Larry J. Siever, stated he thought Mr. Gallucci would do well with further professional training.

**On September 27, 1985, (over 10 years after the LWEC determination) <u>for the first time in this record</u>, there appears a STATEMENT OF ACCEPTED FACTS.**

It is noted that in November of 1974, the OWCP directed Mr. Gallucci to Dr. Stacy Rollins, without the benefit of a SOAF, or questions for resolution. At least the copy of the file provided to Mr. Gallucci did not contain these documents.

On October 22, 1985, Mr. Gallucci was examined by Dr. Henry Feffer, a second opinion physician selected by the OWCP.

**On October 31, 1985, the Bureau of Engraving and Printing, for the first time in this claim, provided OWCP with a copy of Mr. Gallucci's position description.**

<u>This description was received by OWCP over 10 years after the LWEC determination.</u>

Consequently, the OWCP could not have had any understanding of what knowledge, work or background Mr. Gallucci may have developed from this position AT THE TIME OF THE LWEC DETERMINATION. In turn, based on a review of this position description, the OWCP cannot claim that Mr. Gallucci had derived knowledge or work experience relevant to the position of laboratory technician from his work at the Bureau of Engraving and Printing.

On November 14, 1985, OWCP drafted a memorandum to file in which the Claims Examiner stated that Dr. Feffer had called the OWCP and stated that Mr. Gallucci could go " gunning" for someone. Consequently, Dr. Feffer did not want to " come down" "too hard" on Mr. Gallucci in his report for fear of reprisal. Dr. Feffer continued that he felt that Mr. Gallucci's original attending physicians were in fear for their own safety and that is the reason they found his injury to be work-related. Clearly, other than this doctor's alleged report of his interaction with Mr. Gallucci, Dr. Feffer's speculation on the decision of Dr. Sawmiller to find the injury work-related is irrelevant to this claim.

Mr. Gallucci denies making any statement to Dr. Feffer that he would "go gunning" for someone. Moreover, the implication that Mr. Gallucci threatened Dr. Sawmiller is without any basis whatsoever, as the record clearly reflects.

It is noted, however, that Dr. Feffer's written report states he agreed with Dr. Sawmiller's opinion that the long-standing aggravation to Mr. Gallucci's Spondylolisthesis was/is work-related. Dr. Feffer also agreed that Mr. Gallucci had permanent partial physical impairment of between 20 and 25%.

On August 15, 1986, the OWCP undertook another review of Mr. Gallucci's file, yet failed to note the information regarding the Apprentice Program, as well as Mr. Gallucci's failing college grades in mathematics, and lack of a chemistry or physics class at the time of the Loss of Wage Earning Capacity Determination. Again, this "review" should have triggered a Review of the entire file by the Director under 5 USC §8128(a).

On February 10, 1989, Mr. Gallucci sent a letter to Assistant Deputy Commissioner Cain. Within the text of that letter Mr. Gallucci, in laymen's terms, requested an **appeal** of the Loss of Wage Earning Capacity Determination of 1975. A reasonable review of that letter demonstrates that Mr. Gallucci was making an argument that he was not academically qualified for the laboratory technician position at the time of the Loss of Wage Earning Capacity Determination by SCE Markey. Consequently, Mr. Cain should have undertaken a Review by the Director under 5 USC §8128(a).

On February 24, 1989, according to the date stamp of the OWCP, **Mr. Gallucci told the OWCP that his vocational rehabilitation counselor, Mr. Lauterbaugh, only referred him to a state vocational rehabilitation system, and put him in the hands of Mr. Caldwell McMillan. Mr. McMillan had psychological testing of Mr. Gallucci completed. Mr. McMillan stated that based on the testing, the only thing Mr. Gallucci could do was be a cab dispatcher and that there was no training available to him.**

**There is nothing in the file to contradict Mr. Gallucci's statements on this issue.**

In that same letter Mr. Gallucci clearly informed the OWCP that he did not meet the educational and experience standards required to be a

laboratory technician and that he was not offered any training to become a laboratory technician prior to the LWEC of 1975. Mr. Gallucci also informed the OWCP that from 1974 onwards he was given no training by, nor given any assistance from, OWCP to develop a viable vocational rehabilitation training plan. Mr. Gallucci again stated that he was not trained to do the work as a laboratory technician and that he had no experience that would allow him to be a laboratory technician - all of which contradicted the LWEC determination of February 1975.

Mr. Gallucci also stated that he was seeking full retroactive compensation for his out of pocket expenses for his self-directed training program.

This letter should have triggered a Review by OWCP under 5 USC §8128(a).

On June 7, 1989, the OWCP undertook a another review of Mr. Gallucci's file yet failed to note the information regarding the Apprentice Program, as well as the information regarding Mr. Gallucci's failing college efforts prior to and at the time of the Loss of Wage Earning Capacity Determination. Again, this " review " should have triggered a Review by the Director under 5 USC §8128(a).

On July 14, 1989, Dr. Laurence H. Fink examined Mr. Gallucci and completed an OWCP Form-5, via which he stated that Mr. Gallucci could lift no more than 20 lbs. On that form Dr. Fink stated that Mr. Gallucci could do no lifting whatsoever - zero hours per day. Consequently, Dr. Fink's opinion is confusing, contradictory and, at best, vague, all of which required the OWCP to clarify Dr. Fink's work limitations for Mr. Gallucci.

On December 14, 1990, the OWCP undertook another review of Mr. Gallucci's file yet failed to note the information regarding the Apprentice Program, as well as Mr. Gallucci's failing college efforts at the time of the loss of wage earning capacity to termination. The OWCP had a Vocational Rehabilitation Specialist by the name of Maureen H. Olson review the file at this time.

Ms. Olson completed an OWCP Form 3 in which she stated that Mr. Gallucci was not a feasible candidate for vocational rehabilitation because his Lumbar limitations were permanent.

26

Ms. Olson also stated that in her opinion Mr. Gallucci "was not a feasible candidate for vocational rehabilitation" at that time.

As with other people who reviewed Mr. Gallucci's file, Ms. Olson failed to note that at the time of the LWEC determination Mr. Gallucci was NOT qualified for the laboratory technician position – and needed vocational training to become qualified.  Again, this "review" should have triggered a Review of the entire file by the Director under 5 USC §8128(a).

**It is noted that a report regarding a Gloria T. Lancaster is included in Mr. Gallucci's file.  Clearly this report is mis-filed by the OWCP.**

On February 5, 1991, Dr. Laurence H. Fink examined Mr. Gallucci and found positive straight leg raising on the left at 70 degrees and diagnosed Lumbar Spondylolisthesis, as well as low back syndrome, acute.

## ARGUMENT

1.   **AT THE TIME OF THE LWEC DETERMINATION, THE OWCP FAILED TO CARRY ITS BURDEN OF DEMONSTRATING THE SELECTED POSITION WAS WITHIN MR. GALLUCCI'S MEDICAL LIMITATIONS AND RESTRICTIONS.**

At the time of the LWEC Determination the OWCP failed to obtain a medical examination that delineated Mr. Gallucci's specific work restrictions and limitations.  Moreover, the DMA completed a BEC-815, and may well have been influenced by the report of Dr. Rollins, which was a second opinion evaluation that did not provide the doctor with a Statement of Accepted Facts.  Likewise, Dr. Rollins' opinion cannot be utilized because he was a prior treating physician, and he was not well reasoned and rationalized when he made conflicting opinions as to the causal connection between the accepted condition and Mr. Gallucci's work activities.

**After a Hearing on this matter, the Hearing Representative referred the file to a Medical Advisor who stated that Mr. Gallucci could not perform work that required him to lift more than 10 pounds, which disqualified Mr. Gallucci from the selected position because that job required lifting of up to 20 pounds as a work activity.**

It was not until 1985 that OWCP finally obtained a medical report from a treating physician, who had actually conducted an examination of Mr. Gallucci, that delineated Mr. Gallucci's work restrictions and limitations at that time.  Because Dr. Sawmiller cannot make a retroactive set of limitations, the OWCP failed to carry its burden to show that the selected position was within Mr. Gallucci's accepted work limitations in 1975.

Consequently, the most authoritative opinion of Mr. Gallucci's weight lifting limitations near the time of the LWEC determination would be that of April 21, 1976, by OWCP's Medical Advisor, Arthur H. Lewis, M.D., stating that Mr. Gallucci was not capable of lifting more than 10 lbs. as a work activity.

The Hearing Representative's decision states that the Office Medical Advisor found Mr. Gallucci could perform the duties of a lab technician.

**THIS WAS NOT CORRECT**.

The Hearing Representative failed to note that the Office Medical Advisor clearly stated that Mr. Gallucci could not lift more than 10 pounds as a work activity, whereas the constructed position required Mr. Gallucci to lift 20 pounds.  Quite simply, the Hearing Representative failed to note the most informed opinion regarding Mr. Gallucci's physical work restrictions and limitations in the file.

Secondly, the Hearing Representative failed to discuss how Mr. Gallucci was qualified either through age, work experience, training, knowledge or education to perform the highly technical duties of a laboratory technician at the time of the LWEC determination.

**Because Of These Clear Errors Of Fact And Law The Decision Of The Hearing Representative Must Be Reversed.**

**In summary, Mr. Gallucci has demonstrated the original LWEC determination was erroneous because the OWCP did not carry its burden to demonstrate that he could perform the physical activities of the selected position.**

2.    **AT THE TIME OF THE LWEC DETERMINATION, AND THE HEARING THAT FOLLOWED IT, THE OWCP FAILED TO CARRY ITS BURDEN OF DEMONSTRATING THAT MR. GALLUCCI HAD THE KNOWLEDGE, WORK EXPERIENCE, TRAINING OR EDUCATIONAL BACKGROUND TO PERFORM THE DUTIES AND RESPONSIBILITIES OF THE CONSTRUCTED POSITION.**

a.    **The file lacks any evidence whatsoever that Mr. Gallucci had the required knowledge, work experience, age, training or educational background to perform the duties and responsibilities of the constructed position.**

*    There is no evidence in the file demonstrating that Mr. Gallucci was able to perform laboratory tests according to prescribed standards, as stated in the memo to file dated January 31, 1975.

*    There is no evidence in the file to demonstrate that Mr. Gallucci had the educational qualifications, background, training or experience to determine chemical and physical characteristics or composition of materials for purposes such as quality-control, process control, product development and conformity to specifications, as stated in the memo to file dated January 31, 1975.

*    There is no evidence in the file to demonstrate that Mr. Gallucci had the educational qualifications, background, training or experience to adjust and operate laboratory apparatus such as grinders, agitators, centrifuges, ovens, condensers, etc., as stated in the memo to file dated January 31, 1975.

*    There is no evidence in the file to demonstrate that Mr. Gallucci had the educational qualifications, background, training or work experience to be able to perform tests on new materials for quality such as permeability, load-bearing capacity, and cohesiveness, as stated in the memo to file dated January 31, 1975.

*    There is no evidence in the file to demonstrate that Mr. Gallucci had the educational qualifications, background, training or experience to be able to perform work with test solutions used in various manufacturing processes, as stated in the memo to file dated January 31, 1975.

\*      There is no evidence in the file to demonstrate that Mr. Gallucci had the educational qualifications, background, training or experience to be able to examine materials using microscopes and to record the test's results on standard forms or write test reports or understand how to clean and sterilize various laboratory apparatus, as stated in the memo to file dated January 31, 1975.

\*      There is no evidence in the file to demonstrate that based on Mr. Gallucci's age, background and experience he was able to perform the work of a laboratory technician (tester), as stated in the memo to file of January 31, 1975.

b.      **At the time of the LWEC determination, and the hearing that followed, the OWCP knew Mr. Gallucci's background did not provide him with the knowledge, work experience or education to perform the work of a laboratory technician.**

It is clear the OWCP, via SCE Markey and the Hearing Representative, understood Mr. Gallucci's employment history included combat in Vietnam, mine warfare school, demolition training, NCO Academy and leadership school **while in the U.S. Army**.

**There is no evidence in the file to demonstrate that any of this knowledge, work experience, training or educational background provided Mr. Gallucci with the ability to perform the technical work required of a laboratory technician.**

Neither the OWCP nor any vocational rehabilitation counselor or specialist has ever explained, in a well-reasonable or rational manner, how this Army training, and combat in Vietnam, prepared Mr. Gallucci for a position as a laboratory technician.

It is clear the OWCP and the Hearing Representative understood Mr. Gallucci's background employment history included work with the **Federal Fire Service**. Again, there is no evidence in the file to demonstrate that any of the knowledge, work experience, training or educational background provided by this work gave Mr. Gallucci the ability to perform the highly technical work of a laboratory technician.

30

Neither the OWCP nor any vocational rehabilitation counselor or specialist has ever explained, in a well-reasonable or rational manner, how this work with Federal Fire Service prepared Mr. Gallucci for a position as a laboratory technician.

It is clear that OWCP, or at least the Hearing Representative, understood Mr. Gallucci's background employment history included work as an **Apprentice with the Bureau of Engraving and Printing.** Again, there is no evidence in the file to demonstrate that any of the knowledge, training, experience or educational background provided by this work gave Mr. Gallucci the ability to perform the work of a laboratory technician.

Neither the OWCP nor any vocational rehabilitation counselor or specialist has ever explained, in a well-reasonable or rational manner, how this work with Bureau of Engraving and Printing prepared Mr. Gallucci for a position as a laboratory technician.

**The OWCP did not have a copy of the position descriptions of any of these jobs in file when it made the LWEC determination in 1975.**

In summary, the OWCP cannot point to any of Mr. Gallucci's work experience as providing him with the necessary knowledge, training, work experience or educational background to perform the work of a laboratory technician as described in the memorandum of January 31, 1975.

c.    **The OWCP knew Mr. Gallucci's college and educational experience, completed courses and background did not provide him with the knowledge, training, work experience or educational background to perform the work of a laboratory technician.**

A review of the file demonstrates that OWCP did not obtain Mr. Gallucci's college transcripts until eight years **after** the Loss of Wage Earning Capacity Determination was completed.  Those transcripts clearly demonstrate that Mr. Gallucci had no knowledge or educational background whatsoever that would have qualified him to perform any of the testing procedures, activities or other work requirements needed of a laboratory technician as specifically described by the LWEC determination of January and February 1975.

31



It is true that Mr. Gallucci had completed some community college courses prior to February 1975, however, the OWCP failed to demonstrate in 1975 that it had reviewed Mr. Gallucci's transcripts and found that he had passed courses **relevant** to the constructed position, **prior to the date of the LWEC Determination.**

**More to the point, the OWCP could not make this finding because as of February 1975, Mr. Gallucci had passed only one biology class and one basic math class, after having failed, withdrew or was required to repeat every other science or math class he undertook at the college level.**

The best test would be to look at Mr. Gallucci's knowledge, work experience, training and educational background in February 1975 and ask yourself, would you want Mr. Gallucci to have been performing laboratory work for your doctor in February of 1975? Of course not! Mr. Gallucci was unable to pass even basic college math classes in a community college at that time. With his transcript at that time, he was clearly not qualified for a job as a laboratory technician – that is painfully obvious.

## CONCLUSION:

**Based on the above, Mr. Gallucci has met his burden of providing new factual evidence, legal argument and rationale to demonstrate that the LWEC determination of 1975 was erroneous because the OWCP did not have medical documentation to prove that Mr. Gallucci could perform the physical activities of the selected position.**

**Secondly, Mr. Gallucci has demonstrated through new factual evidence, legal argument and rationale that he did not have the knowledge, work experience, training or educational background to perform the job duties and responsibilities of a laboratory technician at the time of the LWEC.**

**For these reasons the LWEC determination of 1975 must be reversed and Mr. Gallucci must be paid all wage loss compensation from the date of the LWEC to the present and ongoing, less any wages earned or other wage loss compensation paid for other OWCP-accepted disabling conditions.**

**ISSUE #2:**

## MR. GALLUCCI WAS IN A "LEARNER'S" CAPACITY UNDER 5 USC §8113(a)

**Mr. Gallucci is entitled to an increased rate of compensation under 5 USC §8113(a) of the FECA because he was in a "learners" position at the time of his injury. Consequently, the OWCP erred by failing to pay Mr. Gallucci an increased rate of pay because his injury prevented him from obtaining the higher-paying position he would have achieved at the end of his <u>formal four-year Apprentice Program</u> at the Bureau of Engraving and Printing.**

It is clear from the evidence of file that Mr. Gallucci was in a *bona fide* Apprentice, i.e., learner's, program – and the OWCP has known this for over 25 years. Consequently, he was in a "learners position" as envisioned by 5 USC 8113(a), and as such, entitled to the higher pay that his Apprentice Program would have provided him but for the disabling injury.

The following references already in the file demonstrate that Mr. Gallucci was in a four year, *bona fide*, Apprentice Program as envisioned by 5 USC 8113(a.

There are also new documents attached that add new and substantially relevant evidence to the file, requiring a review under 5 USC 8128(a) on the issues and new legal arguments made in this request.

1.    April 23, 1973, the employing agency completed a Form CA –1 & 2. On that form <u>the employing agency stated that Mr. Gallucci's occupation was an "Apprentice Plate Printer."</u>

2.    May 22, 1973, the employing agency completed a form CA-16. On that form <u>the employing agency stated that Mr. Gallucci's occupation was a "Plate Printer Apprentice."</u>

3.    September 28, 1973, Dr. Sawmiller stated in a letter that Mr. Gallucci was not "able to work as a <u>Printer's Apprentice.</u>"

33

4.    October 30, 1974, OWCP claims examiner Thomas Markey completed a Form CA-55.  On that form CE Thomas Markey stated that Mr. Gallucci's Job At The Time Of Injury was an "Apprentice Plate Printer."

5.    January 7, 1975, the OWCP completed a vocational rehabilitation referral.  On that form CE Thomas Markey stated that Mr. Gallucci's occupation at the time of Injury was "Apprentice Plate Printer."

6.    August 25, 1975, a hearing officer stated for the record that Mr. Gallucci was employed "as an Apprentice Plate Printer."

7.    July 13, 1976, the hearing officer issued a decision stating that Mr. Gallucci was employed "as an Apprentice Plate Printer."

8.    January 16, 1974, the employing agency issued a separation document which appears to be a Form 50 for that time.  That form stated Mr. Gallucci was employed as an "Apprentice Plate Printer."

9.    October 26, 1976, Mr. Thomas Markey drafted a letter to Congresswoman Holt.  The letter stated that Mr. Gallucci was employed as an "Apprentice Plate Printer."

10.    June 10, 1974 the employing agency completed a notice of termination.   That notice of termination stated that Mr. Gallucci was employed as an "Apprentice Plate Printer."

11.    September 27, 1985, the OWCP drafted a letter to the Bureau of Engraving and Printing asking for Mr. Gallucci's job description effective April 23, 1973.

12.    October 31, 1985, the Bureau of Engraving and Printing responded to the letter from OWCP dated September 27, 1985.  On the attached job description stated, the Bureau of Engraving and Printing wrote, "Printers and Apprentices use the same position description."  Within that job description it is stated, in part:

I.    Skills and Knowledge Required

**Must have successfully completed the four-year Plate Printer Apprenticeship... [emphasis added]**

34



The full text of the job description is attached for reference:

In further support of the argument that Mr. Gallucci was in a " learner's position " we direct the OWCP's attention to the following documents:

1.    Certificate Of Medical Examination.  Block number 3 of part B, states as follows:

> **As an Apprentice Plate Printer, <u>incumbent serves in a four-year training program</u> [emphasis added]**  to gain technical craft knowledge[s] [sic] and skills to perform the difficult and exacting work of operating high-speed press equipment.  He will be exposed to potential skin irritations from the inks and solvents used, and the inherent risk of injury involved with operating large machinery with many moving parts. Lifts wiping rollers, paper, etc., weighing up to 75 lbs.

2.    "Notification of Personnel Action" with an effective date of January 10, 1973.  It is noted that Mr. Gallucci was in the position of "<u>Apprentice Plate Printer</u>."  In block # 30 of that form it states as follows:

> Mr. Gallucci has completed his first six months of training and his services are satisfactory.

It has long been held by the ECAB that a position that could be held as a permanent position is not a "learner's position."

It is well understood that Mr. Gallucci could not remain in any level of Apprenticeship for longer than six months.  The apprenticeship program at the Bureau of Engraving and Printing does not allow an Apprentice to stay in a given level for a career – it is either progress to the Journeyman Level, or be dismissed.  Consequently, this was not a permanent, or career, position unless and until Mr. Gallucci had completed the entire <u>four year</u> Apprentice Program and had been promoted to at least "Wage Scale 2."

Because Mr. Gallucci could not remain in any Apprenticeship level for more than six months he was clearly in a "learners position" as envisioned by 5 USC §8113(a) of the Federal Employees Compensation Act.  As such, he is entitled



to increases in his compensation rate recomputed on his six months Apprenticeship anniversaries until he [would have] reached Wage Scale 2 level.

It is also noted that in Block # 15 Mr. Gallucci was receiving 55% of the basic rate for a fully trained Plate Printer.  That is, he was receiving $3.96 per hour.

As noted by Block #20, Mr. Gallucci was given a pay increase to 60% of the basic rate for a fully trained Plate Printer.  That is, <u>only</u> because of his satisfactory completion of his first six months <u>as an Apprentice</u>, was he to be paid $4.321 per hour.

This Apprenticeship program provided mandatory, or automatic, increases every six months over a four year period, and then mandatory, or automatic, increases to Wage Scale 2.

**All Plate Printers must progress to the competency level of Wage Scale 2 in order to be permanent employees of the Bureau of Engraving and Printing.**

Because Mr. Gallucci had established a track record of satisfactory performance and had received one mandatory increase on schedule, the OWCP must increase his wage rate in accordance with the steps mandated by the Apprenticeship Program of the Bureau of Engraving and Printing.

Consequently, the OWCP must, retroactively, increase Mr. Gallucci's wage rate 5% at six month intervals until his rate of pay would have reached that of a Journeyman Plate Printer, Wage Scale 2, plus any increases in pay rates, plus night or shift differentials that Mr. Gallucci was entitled to receive.  After this time period, the OWCP must pay Mr. Gallucci his unpaid wage loss compensation at the Wage Scale 2 rate, plus any Cost of Living Increases accrued under the FECA, less any actual wages earned or other wage loss compensation paid for other OWCP accepted disabling conditions.

Consequently, the OWCP must re-compute Mr. Gallucci's wage loss compensation in light of the fact that Mr. Gallucci was entitled to increases in his basic wage rate as part of the well-established Apprentice Program at the Bureau of Engraving and Printing.



**Issue #3:**

**THE OWCP MUST RE-COMPUTE MR. GALLUCCI'S DATE OF INJURY WAGE RATE  BECAUSE HE RECEIVED A RETROACTIVE PAY RAISE THAT WAS NEVER ACCOUNTED FOR BY THE OWCP.**

**<u>Mr. Gallucci received a retroactive wage rate increase that made this hourly rate of pay approximately $5.85 per hour as of the Date of Injury.</u>**

Consequently, the OWCP must re-compute Mr. Gallucci's wage loss compensation to reflect this higher rate of pay as of the Date of Injury.

Consequently, the OWCP owes Mr. Gallucci compensation based on a date of injury wage rate of approximately $5.85 per hour, and not the $4.321 plus night differential rate that OWCP used to compute his wage loss compensation when he was injured.  This amount is owed from the first day of wage loss compensation to the present and ongoing.

It is understood the OWCP must verify Mr. Gallucci's actual pay rate, and that of any retroactive pay raise/s with the employing agency.  These figures are estimated based on the information available to Mr. Gallucci at this time.

## CONCLUSION:

Based on the above new facts and evidence added to the record, and new legal arguments not previously considered, Mr. Gallucci requests OWCP:

1.    Reverse the Loss of Wage Earning Capacity Determination of 1975, and pay him all wage loss compensation not paid because of that erroneous and unsubstantiated determination.  The OWCP would be entitled to offset any wages earned over the intervening 26 years, or other wage loss compensation paid due to other OWCP accepted disabling conditions.

2.    Re-compute Mr. Gallucci's Date of Injury wage rate because he was in a "learner's position" under 5 USC §8113(a), and pay the unpaid compensation owed him as detailed above from the Date of Injury to the present and ongoing, less any wages earned, or compensation paid for other claims accepted by the OWCP for disabling conditions, over the intervening 26 years.

3.    Immediately pay Mr. Gallucci the unpaid wage loss compensation between the $4.32 that compensation was based on, and the $5.85 that he was actually earning on the Date of Injury.

Mr. Gallucci has provided new and relevant evidence, new legal arguments not previously considered and demonstrated the OWCP has committed clearly reversible error in its previous decisions.  The OWCP must review his case under 5 USC §8128(a), reverse the LWEC determination of 1975 and re-compute Mr. Gallucci's wage rate becaue he was in a "learner's capacity" at the time of his disabling injury.  OWCP must also re-compute Mr. Gallucci's Date of Injury pay rate and pay him all unpaid wage loss compensation due him because of that error since the Date of Injury.

Respectfully submitted,

Thomas P. Fochs, PC
Attorney at Law.