# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM T. GALLUCCI ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 1:06cv00020 (GK) |
| ) | |
| MARK L. SCHAFFER, et al. ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF WILLIAM T. GALLUCCI

I, William Gallucci, having first been duly sworn, depose and say under oath:

1.　　　I am an adult citizen of the United States and resident of the State of Virginia and am competent to testify on all matters stated herein upon personal knowledge.

2.　　　I am a decorated Vietnam veteran. I served in Vietnam for 13 months from 1969-70. I was physically injured there during night patrol.

3.　　　Upon returning to the United States, I obtained a job at the at the United States Bureau of Engraving (the "Bureau"), a part of the United States Treasury ("Treasury"), as an apprentice plate printer and commenced work on July 9, 1972. The apprentice plate printer program is a four year program whereby a participant will become a journeyman plate printer after completing the program. As an apprentice, my pay was to increase annually based on satisfactory performance and would further increase upon completing the apprenticeship program and becoming a journeyman.

4. On April 23, 1973, I injured my hip and back while completing my apprentice plate printer program. Specifically, while lifting and changing wiping rags from a 50-pound weight, I developed pain in the left hip and back, which became progressively worse.

5. After my injury, I retained Mr. Schaffer of Ashcraft & Gerel to represent me. Mr. Schaffer commenced to represent me on or before October 20, 1973.

6. Represented by Mr. Schaffer, I applied in 1973 for federal worker's compensation benefits as a result of my on-the-job injury while employed for the Bureau, timely making my application to the Office of Workers' Compensation Programs ("OWCP"), a division of the Department of Labor ("Labor").

7. At all times while being represented by Mr. Schaffer, my rights were controlled by the FECA, codified at 5 U.S.C. §§ 8101 *et seq.* Then, as now, the Act included a provision specifying that persons who, like me, are injured while in an apprentice position are entitled to enhanced compensation commensurate with their having timely advanced at such time as the advancement would have been achieved in the ordinary course, but for the injury. Specifically, the Act entitles persons injured while in a training position to increased compensation as though they progressed past the learning position with such enhancement taking effect at the time they would have done so. Mr. Schaffer failed to competently represent me and obtain the benefits due to me through the Act.

8. In the initial proceedings, OWCP calculated my monthly compensation payment based on the pay rate for an apprentice printer and included no provision for enhancement to the pay rate for a journeyman printer, despite clear statutory law, Labor precedent and Labor policy requiring that a federal worker injured while in an apprenticeship status receive worker's compensation payments at the pay rate of a journeyman at such time as the non-injured members

of the worker's apprentice class advance to that status.

9. On or about July 9, 1973, my worker's compensation benefits should have been increased as though he had advanced to the next year of apprenticeship on that day. Mr. Schaffer did not advise me of my right to such increases nor did Mr. Schaffer request OWCP to implement them

10. On or about July 13, 1976, following the aforementioned hearing at which Mr. Schaffer represented me, OWCP affirmed its calculation of my LWEC. On August 19, 1976, OWCP notified Mr. Schaffer that the LWEC calculation had been affirmed and was then final and appealable. Thereafter, Mr. Schaffer met with me at Ashcraft & Gerel's Washington, D.C. office. At that meeting, I asked how OWCP could have arrived at such a low figure for his benefits; in response, Mr. Schaffer told me that OWCP could do "anything they want" and advised me that any effort to fight OWCP for increased benefits would be "pointless". Again, Mr. Schaffer did not advise me about, or seek to invoke or prosecute, my rights to increased payments under section 8113 of the Act

11. As a result of Mr. Schaffer's negligence, I have been underpaid for approximately twenty eight (30) years.

12. On May 15, 2001, Mr. Thomas Fochs, Esq., on my behalf, filed a Request for Review under 5 U.S.C. §§ 8128(a) seeking review of my benefit calculation.

13. In November of 2002, I called Ashcraft & Gerel, LLP and spoke with an attorney from the firm for around forty minutes. During this conversation, I detailed how I had been underpaid for over thirty years due to Mark Schaffer's failure to competently and thoroughly represent me. At the conclusion of the conversation the attorney told me that "there was nothing

they can do to help me."

14. In the Summer of 2002, I brought the apparently erroneous pay rate calculation to the attention of OWCP, and requested that the calculation be reviewed and corrected, both prospectively and retroactively, according to the Act and Labor policy.

15. On October 15, 2002, OWCP issued a preliminary finding that the pay rate used in my case was erroneous, based on section 8113 of the Act and longstanding Labor policy. In its preliminary finding, OWCP concluded that my compensation payments for the time period beginning on July 13, 1976 previously should have been, and prospectively should be, based on the pay rate for a journeyman printer, not an apprentice printer.

16. The Bureau resisted paying me and filed numerous appeals from November 2002 to June 2003.

17. The preliminary finding by OWCP was provided to me and to the Bureau for comment before becoming a final decision. The Bureau staunchly resisted paying, presumably because of the size of the sums payable as a result of OWCP's finding. Whatever the cause of the Bureau's resistance, the resulting backlash plunged my life into an odyssey of agency paperwork and ultimately into litigation.

18. On May 21, 2003, OWCP issued a final decision that the pay rate in my case had indeed been erroneously calculated. OWCP's decision states that the amount owed to me for the period from August 13, 1981 to September 9, 2000 due to the pay rate error was **$828,980.11**. The decision also states that the total amount due to me would be paid to in eight payments. (OWCP copied the May 21, 2003 decision to Treasury. Further, on May 28, 2003, OWCP also wrote separately to Treasury to explain its reasons for rejecting the arguments Treasury had advanced up to that point.)

19. In its May 21, 2003 decision, OWCP indicated that it was making a separate calculation of the amount owed to me for the time period September 10, 2000 to June 25, 2003 and expected to have the calculation completed by the end of June 2003. On information and belief, OWCP also determined to separately calculate the amount of back-benefits owed to me due to the incorrect use of the apprentice pay rate for the period from April 23, 1973 to August 12, 1981 because Labor's records for the earlier period of time are not yet computerized or are otherwise in such condition that a calculation of the amount is administratively difficult. (The two separate periods of time, April 23, 1973 to August 12, 1981 and September 10, 2000 to June 25, 2003, are hereinafter referred to as: "the two additional periods of time.")

20. The first payment, of those specified in the May 21, 2003 letter by OWCP, in the amount of $99,999.99, was later deposited into my bank account.

21. However, by letter dated June 4, 2003, Treasury asked Labor not to make the payments specified in the May 21, 2003 decision letter. Treasury asserted that "new" information had come to light, falsely alleged that there were indications of "fraud" with respect to my case, and requested the opportunity to further investigate the case.

22. After receiving Treasury's communication, OWCP personnel advised me not to attempt to spend any of the money from the one payment that had been made to him. OWCP did not make the remaining payments and, in effect, it *de facto* froze the one payment it did make pending review of Treasury's allegations.

23. Though procedurally and factually baseless, Treasury's allegations went to the heart of my claim for back-benefits. By virtue of Treasury's challenge and OWCP's directive that he not spend the money it had paid him to that point, my affairs were plunged into a state of total uncertainty such that I was not certain to receive any back-benefits at all.

24. Thereafter, Treasury sought and failed to prove that I (while represented by Mr. Schaffer) had committed some sort of fraud in connection with his initial application for benefits.

25. On June 28, 2004, I filed a lawsuit in the United States District Court for the District of Columbia to force OWCP to uphold its finding and pay me the money it agreed I was owed. OWCP initially decided that I was owed $828,980.11 in back benefits from August 13, 1983 to September 9, 2000 and that separate calculations would need to be made for the amount I am owed for the time periods from September 10, 2000 to June 23, 2003 and April 23, 1973 to August 12, 1981.

26. Also in June 28, 2004, after the filing of the *Gallucci v. Chao* case, I received - through my attorney- a letter from OWCP dated June 25, 2004, in which OWCP issued another opinion concluding that I was entitled to be paid at the rate of a journeyman printer, rather than at the rate of an apprentice, from 1976 (when my apprenticeship class would have reached journeyman status), to the present.

27. On June 29, 2004, OWCP issued a Notice of Proposed Reduction of Compensation and on July 16, 2004, OWCP issued a revised calculation, in which it concluded that I was entitled to total back-benefits of $661,223.96 (not the $828,980.11 for the first period plus additional sums for the two additional periods).

28. On July 16, 2004, OWCP issued a "revised" calculation, in which it concluded that I was entitled to total back-benefits of **$661,223.96** (not the **$828,980.11** for the first period plus additional sums for the two additional periods). In other words, whereas before it had indicated I would be receiving **$828,980.11** <u>plus</u> additional lump sums for back-benefits associated with underpayment during the two additional periods, by its July 16, 2004 letter OWCP indicated that I was owed at most **$661,223.96** for back-benefits for all time periods. Thereafter, OWCP paid the

balance due to me under its revised calculation, the minimum sum conceded to be due him from the government for back-benefits.

29. In effect, by issuing the revised calculation and paying the balance not in dispute, OWCP rejected Treasury's allegations that I was not entitled to any back-benefits and lifted its directive that I not spend any of the payment OWCP had previously made to him.

30. I have sought redress of the erroneous compensation rate pursuant 5 U.S.C. §§ 8113 through administrative processes from the summer of 2002 to June 29, 2004. I have brought this suit when my benefits were adjusted downward, and I came to realize the full extent of my damages.

31. As a result of Mr. Schaffer's above-described omissions, I was underpaid benefits for three decades. I have been able to wrest a back-benefits award for some of these benefits. I have incurred and continue to incur substantial professional fees seeking to obtain, defend and collect the back-benefits that Mr. Schaffer failed to seek in 1973. Because of the large lump sum created by the three-decade delay in requesting my enhanced compensation, the agency responsible for my benefits has hotly contested the claim -- to a point bordering on persecution.

32. Ultimately, by virtue of the above-described events that transpired in 2004, I did obtain a clear award such that he now I have clear title to a specific sum of money, *i.e.*, the monies he has been paid in back-benefits. That is, the sums paid to me are now conceded by the federal government to be mine.

33. An award of back interest on the back-pay is not available to me as a matter of federal law. As a result, I have lost the value of the use of the benefits payments to which I was entitled for many, many years. The value of the lost back interest is estimated preliminarily to be at least $2,500,000; and, though calculating this figure with precision may require expert advice and may be an issue best determined through trial, it may be higher still.

34. As mentioned, in 2004, OWCP decreased my back-pay award by purporting to retroactively re-evaluate my LWEC as of two points in time, one in 1983 and one in 1992. However, OWCP did not in fact seek to decrease my benefits in either 1983 or 1992.

35. On information and belief, the impetus for OWCP's after-the-fact LWEC "recalculations" of my benefits was Treasury's resistance to payment of three-decades of back-benefits in a lump sum following OWCP's initial determination. As evidenced by the absence of any effort to actually conduct an LWEC adjustment in 1983 or 1992, it appears that had Mr. Schaffer acted during to claim and procure the increased benefits to which I was entitled, I would have received additional benefits between 1973 and 2004 equal to the entire **$828,980.11** initially calculated by OWCP as due to me for the period August 13, 1981 to September 9, 2000 plus comparable additional sums during the two additional periods.

36. At present, it is unclear whether OWCP's reductions will stand. These reductions were challenged in *Gallucci v. Chao*, which was dismissed on June 17, 2005, as well as the still continuing OWCP administrative process triggered by OWCP's above-discussed issuance of a formal notice to reduce benefits on June 29, 2004, before the *Chao* suit was dismissed.

37. But for Mr. Schaffer's breaches of duty I would not be facing a reduction of my benefits as of 1983 or 1992.

38. On February 12, 2007, the OWCP's issued a Notice upheld, then I have been damaged by the amount of the reductions and the lost value of those funds over time (*i.e.*, back interest); if OWCP's LWEC recalculations are reversed, then I will be made whole as to the actual back benefits thus reinstated, but will still have been harmed by the value of his loss of use of the money over time because back-interest is not recoverable from the OWCP process. The precise amount of these additional damages cannot be calculated until the outcome of the challenge to

OWCP's recalculation of back-benefits is known.

**I SOLEMNLY AFFIRM UNDER PENALTY OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING DECLARATION ARE TRUE AND CORRECT.**

                                                __/s/ William Gallucci_____
                                                William Gallucci

\*An original copy of the Declaration of William Gallucci held at the Law Offices of Simmons & Associates, Chtd.

\\10.0.0.20\files\Client Files\Gallucci, William\Opposition R. 12 Motion\Supplemental Briefing\declarationofGallucci.wpd